**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| ADAM McKENZIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-CV-3304 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Adam McKenzie appeals from the denial of his application for Supplemental Security Income ( "Disability Benefits") under the Social Security Act. 42 U.S.C. § 1381a, and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). McKenzie has filed a Brief in Support of Complaint (d/e 12), and Defendant Commissioner of Social Security has filed a Memorandum in Support of Motion for Summary Affirmance (d/e 14).[1] The parties consented, pursuant to 28 U.S.C. § 636(c), to have this matter proceed before this Court.

---

[1]Neither party has filed a motion for summary judgment as required by the Local Rules. <u>Local Rule</u> 8.1(D). The Court deems the memoranda filed by the parties to be requests for summary judgment. Counsel are to comply with the Local Rules in any future proceeding before this Court.

Consent to Proceed Before a United States Magistrate Judge, and Order of Reference entered April 15, 2011 (d/e 10).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

McKenzie was born on August 23, 1964.  Answer to Complaint (d/e 8),attached Certified Transcript of Record of Proceedings Before the Social Security Administration (R.), at 23.  He quit school in the tenth grade.  He has no past relevant work experience.  He last worked for about two months in 2008; he worked moving materials and helping to set up a department.  R. 36.

McKenzie filed his application for Disability Benefits on May 9, 2008. McKenzie suffered from drug abuse, mental problems, and problems with the use of his right arm.  On June 6, 2008, McKenzie and his brother Ron McKenzie completed a Social Security Administration form entitled Function Report-Adult.  R. 163-76.  According to this Report, McKenzie lived with Ron and spent his day watching television, looking out the window, walking back and forth, and talking to Ron.  R. 163.  McKenzie would walk in his sleep, talk in his sleep, and wake up screaming.  R. 164. Ron dressed and shaved McKenzie, and also cut McKenzie's hair.  R. 164. McKenzie would only take a "Bird Bath" and would not get in the bathtub. R. 164.  McKenzie would "forget what he doing very often."  R. 164.

McKenzie needed to be reminded to change clothes, bathe, shave, and take his medicine. R. 165. McKenzie swept the floor, took out the garbage, and cleaned the walls. R. 165. McKenzie was not allowed outside because he got lost. R. 166. McKenzie did not drive because, "forgot to turn go through red lights I think is green. He forgets what he is doing." R. 166. McKenzie went to see family and friends with his brother and sister and attended church every Sunday and some Wednesdays. R. 167.

On July 8, 2008, state agency physician Dr. Fauzia Rana, M.D., performed a physical examination of McKenzie. McKenzie stated that he suffered a stab wound in his right arm in the past and had problems using his right arm ever since. He also complained of depression. He stated that he has auditory hallucinations and thoughts of suicide. He stated that he had attempted suicide in the past. He stated that he had been hospitalized for depression in the past. He reported use of alcohol, heroin, and cocaine. R. 294. He stated that he used drugs one week before the examination. R. 294. During the examination, McKenzie acted confused, stared at the ceiling, walked back and forth and then jerked his head, and sometimes started laughing. R. 295. Dr. Rana diagnosed status post right arm stab wound. Dr. Rana could not conduct neurological testing because McKenzie would not cooperate with instructions. R. 296.

On the same day, July 8, 2008, state agency psychiatrist Ana Gil, M.D., performed a psychiatric evaluation.  McKenzie was well dressed, well groomed, and had good hygiene.  McKenzie had mild psychomotor agitation.  He rocked back and forth in the chair during the interview. R. 302.  McKenzie reported a twenty-three year history of alcohol, cocaine and heroin abuse.  He stated that he had used heroin within a week of the examination.  R. 302.  He reported that he used drugs on a weekly basis. R. 302.  He reported a history of seizures, blackouts, tremors, cirrhosis, and the DT's, and stated that he had been in jail for assault related to his substance abuse.  R. 302-03.

McKenzie denied any current hallucinations, suicidal or homicidal thoughts, or thoughts that anyone wanted to harm him.  Dr. Gil noted that McKenzie was cooperative and related information in a logical manner. McKenzie stated that he dressed and groomed himself and took care of his own hygiene.  McKenzie stated that he stayed in his room most of the time. He stated that he left his home about once a week to get heroin and cocaine.  He stated that he was unable to travel because he got lost. R. 303.

McKenzie appeared confused and failed virtually every test that Dr. Gil gave him.  He stated the date as January 9 (instead of July 8) and stated that he did not know the year.  R. 304.  When Dr. Gil asked him to

repeat a sequence of numbers, McKenzie stated that he could not.

McKenzie gave "February of 69" as his birth date, when he was born on

August 23, 1964.  McKenzie could not give the route he took to come to Dr.

Gil's office.  McKenzie said that he could not perform any arithmetic, even if

he used his fingers.  McKenzie said, "5+2=10, 8+3=9, 10+2=10,

10-2=6, 6-4=1, 12-7=7."  R. 304.   McKenzie said that he did not know what

2x3, 5x4 or 3x7 was.  R. 304.  McKenzie said Harold Washington was the

current President.  McKenzie could not name any recent Presidents.  When

asked what city he was in, McKenzie said, "Illinois."  R. 304.  McKenzie

said that if he smelled smoke in a movie theater he would smoke. R. 305.

McKenzie stated that he did not know the meaning of the phrases, "You

can't judge a book by its cover" and "There's no use crying over spilled

milk."  R. 305.

Dr. Gil noted that McKenzie was able to give a coherent and logical

history, but had a lack of cooperation, effort, and motivation in the cognitive

portion of the examination.  R. 305.  Dr. Gil opined that McKenzie's

diagnosis was consistent with malingering and observed no evidence of

psychosis or thought process disorder.  R. 305.   Dr. Gil opined that

McKenzie could not handle his own funds.  R. 306.

On February 9, 2009, state agency psychologist Dr. Frank Froman,

Ed.D., examined McKenzie.  McKenzie moved from Chicago to Quincy,

Illinois, about four months earlier. He now lived with his sister in Quincy. R. 340. McKenzie's clothes were "disheveled" and his personal hygiene was "profoundly lacking." R. 340. McKenzie stated that he dropped out of school in the tenth grade and started using cocaine. R. 304. McKenzie reported a long-term weekly habit of cocaine use. R. 341. He last used cocaine one week earlier. R. 341. He reported drinking an occasional beer. R. 341. McKenzie stated that he was inactive in religion. R. 341. McKenzie reported visual hallucinations. McKenzie reported seeing "black little furry things running around." R. 342. McKenzie reported minimal contact with others. He said that he preferred his own care. R. 341. McKenzie stated that he swept, mopped, cleaned the bathroom, and vacuumed. R. 341.

McKenzie provided a large number of incorrect answers on mental status testing. Dr. Froman stated that he had difficulty determining McKenzie's veracity because McKenzie failed virtually all of the test items requiring thought. R. 342. Dr. Froman noted that if McKenzie "were scored on this testing, he would have earned a full scale IQ of 45, which is not seen to pick up some of the flavor of the man's intellect." R. 342. Dr. Froman also stated that McKenzie rocked continually and made clicking noises during the test. R. 342. Dr. Froman stated that the test results indicated impairments in all cognitive and memory areas, some of which

"appeared extremely suspect, and most unlikely."  R. 343.
Dr. Froman stated that it was significant that McKenzie answered no
mental status items correctly.  R. 343.

Dr. Froman diagnosed McKenzie with active polysubstance abuse
and developmental cognitive disability with an estimated IQ of 65 to 70.
R. 343.  Dr. Froman opined that McKenzie would have extreme difficulty
performing one and two-step assembly.  R. 343.  He opined that McKenzie
did not appear to be able to relate adequately to coworkers, understand
oral and written instructions, and withstand the stress of customary
employment.  R. 343.  Dr. Froman also stated that McKenzie could not
read and could not handle cash.  R. 343.

Dr. Froman noted that he reviewed, "[a]n excellent evaluation
performed 7/8/08 by Dr. Ana Gill, MD in which she also raised questions
about claimant's veracity."  R. 343.  Dr. Froman also noted that the
examination took 45 minutes, but McKenzie "thought it was '5 minutes.'"
R. 343.

On February 24, 2009, state agency psychologist, Dr. John
Tomassetti, Ph.D., reviewed McKenzie's records and opined that McKenzie
met the listing of severe impairment in the Social Security Regulations for
substance abuse.  20 C.F.R. Part 404 Subpart P, Appendix 1 (Listings), §§
12.09(A) and 12.09(B).  R. 326, 334.  Dr. Tomassetti opined that McKenzie

had marked limitations in activities of daily living; maintaining social functioning; and concentration, persistence, and pace.  R. 336.

On March 7, 2009, agency physician Dr. Raymond Leung, M.D., examined McKenzie.  R. 354-57.  McKenize complained of numbness and pain in his fingers; difficulty gripping with his right hand; and weakness in his right arm.  R. 354.  McKenzie could remember his birth date and Social Security number and had normal affect, dress, and hygiene.  R. 355.  McKenzie's fund of knowledge appeared to be normal and his affect, dress, and hygiene were within normal limits.  R. 354.  Dr. Leung opined that McKenzie may have difficulties managing his funds because of decreased memory.  McKenzie could not oppose his right thumb to the fifth finger in the right hand, had reduced right pinch and grip strength, and had no sensation to light touch or pinprick in the right first through third fingers.  R. 356.

On May 6, 2009, McKenzie went to Transitions of Western Illinois (Transitions) for mental health assessment and treatment.  R. 363-76.  He was seen by a counselor.  McKenzie complained of intrusive auditory and visual hallucinations; disorganized behavior including forgetfulness, difficulty with activities of daily living (such as shaving and self care) and paranoid ideation; and discomfort in crowds.  R. 363.  McKenzie reported that he suffered from depression, psychosis, anxiety, trauma, and other

mood problems. R. 363.  McKenzie reported problems with social adjustment, work, self care or daily living skills.  R. 364.  McKenzie stated that he had in the past jumped out a window due to a command from an auditory hallucination.  McKenzie also reported intentionally overdosing on medication and cutting his wrists.  R. 364.  McKenzie reported a history of alcohol, marijuana, cocaine, and heroin use.  He reported no use of alcohol, marijuana or cocaine in the prior six months.  R. 368.

The counselor who saw McKenzie on May 9, 2009, noted that McKenzie had normal dress, grooming, speech, concentration, thought process, and memory.  R. 372.  The counselor noted that McKenzie had poor eye contact; a flat affect; depressed mood; feelings of paranoia, worthlessness, and hopelessness; and auditory and visual hallucinations suggested by talking and gesturing.  R. 372.  The counselor diagnosed McKenzie with paranoid-type schizophrenia and mood disorder.  R. 373.

On May 6, 2009, McKenzie's daughter Latonya Thompson, completed a questionnaire regarding McKenzie's activities.  She stated that McKenzie could only use his left hand.  R. 359.  She stated that McKenzie's brothers helped him shave, but McKenzie bathed himself. R. 360.  She stated that McKenzie could not stay still or pay attention long enough to perform any chores.  She stated that McKenzie could only walk two and one-half blocks before he would sit and stare, rocking back and

forth; he would say that he was waiting for people to go past, but no one was there.  R. 360.  She stated that McKenzie would stand, sit, and lie in a constant pattern.  R. 360.  She stated that McKenzie cried about five times a week.  When asked why, McKenzie just repeated his father's initials and that his father was sick.  His daughter stated that when she would ask McKenzie to throw things away, he would put them in the refrigerator or pantry.  When she pointed out his mistake, McKenzie would get mad at himself and would rock and hit his head.  R. 361.

On June 11, 2009, McKenzie saw Dr. Valentina Vrtikapa, M.D., for assessment at Transitions.  R. 377-79.  McKenzie reported a 20 to 30 year history of auditory and visual hallucinations.  R. 377.  McKenzie stated that he saw visions, thinks people were after him or talking about him, and heard mumbling voices.  R. 377.  McKenzie denied feeling depressed, hopeless, or helpless.  He also denied symptoms of mania, hypomania, and obsessive or compulsive behavior.  R. 377.  Dr. Vrtikapa stated that McKenzie appeared to be responding to internal stimuli.  McKenzie was taking care of his basic needs.  R. 377.  Dr. Vrtikapa diagnosed psychotic disorder, not otherwise specified, and prescribed an antipsychotic drug, Haldol.  R. 378-799.

On June 18, 2009, McKenzie met with Dr. Vrtikapa's nurse.  He reported a decrease in the frequency and intensity of his auditory hallucinations, but stated that he still was not going out.  R. 383-84.  On June 25, 2009, McKenzie reported that he felt better, but was not leaving the house.  Dr. Vrtikapa increased McKenzie's dosage of Haldol. R. 385-86.

On August 6, 2009, McKenzie saw Dr. Robin Holtman, M.D., because of problems with his right hand and arm.  McKenzie reported occasional tingling and sharp pain in his right hand and no feeling in his right hand and the back of his right forearm.  R. 388.  McKenzie stated that he had been stabbed in his upper right arm in 1993.  R. 388.  McKenzie stated that he had a history of visual hallucinations and was prescribed medication for daily use, but he was only taking the medicine as needed because his hallucinations were stable and he was not having them. R. 388.  Dr. Holtman found that McKenzie's right hand was slightly weaker than his left and that McKenzie had diminished reflexes on the right. R. 390.  Dr. Holtman diagnosed hallucinations and neuropathy, secondary to right upper arm nerve injury.  R. 390.

On September 10, 2009, Dr. Vrtikapa saw McKenzie again. Dr. Vrtikapa noted that the medication was having a fair impact on McKenzie's symptoms.  Dr. Vrtikapa continued McKenzie's treatment

regimen.  R. 437-39.  On September 22, 2009, McKenzie saw Dr. Holtman

again.  Dr. Holtman diagnosed neuropathy secondary to right upper arm

nerve injury and ordered an EMG study.  R. 410.

On October 5, 2009, Ben Failor, a community support worker at

Transitions, completed an assessment of McKenzie's mental conditions.

R. 406-08.  The assessment was also signed by a licensed clinical social

worker Alan Obert.  Failor opined that McKenzie had moderate limitations

in his ability to make judgments on simple work-related decisions.  Failor

opined that McKenzie had marked limitations in his ability to understand

and carry out simple instructions, understand and remember complex

instructions, and to carry out complex instructions.  R. 406.  Failor opined

that McKenzie had marked limitations in all areas concerning his ability to

interact appropriately with supervisors, co-workers, and the public.  R. 407.

Failor stated that McKenzie had past bizarre behaviors when he became

paranoid and delusional and had poor social skills marked by poor

socialization and "legal history/physical violence."  R. 407.   Failor opined

that McKenzie's disability began on April 1, 2006.  R. 407.  Failor also

opined that McKenzie could not handle benefits in his own best interest.  R.

408.

The Administrative Law Judge (ALJ) conducted an evidentiary

hearing on October 13, 2009.  R. 30-54.  McKenzie appeared with his

attorney. A vocational expert Michelle Peters also appeared by telephone. McKenzie's attorney said that McKenzie's alleged onset date was August 20, 2008. R. 34. McKenzie testified that he was right-handed and lived alone with his sister. R. 35. McKenzie stated that he dropped out of school in the tenth grade. R. 35. He testified that he had difficulty using his right hand. He had problems picking up things, carrying, lifting, and feeling things. R. 37. He also experienced sharp pain once or twice a week through his arm into his fingers. R. 37. He testified that he could only use his little finger and ring finger on his right hand to lift anything. R. 43-44. He could carry a gallon of milk with these two fingers. R. 44. He used his left hand for most things. R. 44. He had no problems with his left arm and hand.

McKenzie testified that he had problems with his memory, with hearing voices telling him to hurt himself, and with seeing black hairy things crawling past him. R. 39, 45. He testified that his medication helped and he no longer heard voices much, but he still saw things every other day. R. 39. He testified that he now heard voices approximately once every other week. R. 45. He testified that he sometimes felt depressed and sometimes felt excited. R. 39-40. He testified that he had panic attacks once a month while sleeping and had problems with being in crowds. R. 46-47. He testified that the medicine affected his energy level. He took naps every

day.  R. 48-49.  McKenzie testified that he could live on his own, but would need someone to come by and help him.  R. 42.

McKenzie testified that he went to church every week and had no problems at church.  R. 40.  He did not go shopping.  His counselor from Transitions visited him once a week.  R. 40-41.  McKenzie testified that he last used drugs in August 2008 when he moved from Chicago to Quincy. R. 42.

Vocational expert Peters then testified.  The ALJ asked Peters to consider a person with McKenzie's age and education, and no past relevant work experience who was capable of medium work, but no climbing ladders, ropes, or scaffolds; frequent, but not repetitive reaching, handling, fingering, and feeling with the right arm and hand; and only capable of unskilled work with no more than superficial contact with the general public and no more than occasional contact with supervisors. R. 51.  Peters opined that such a person could perform janitorial work, assembly work, and packaging work.  Peters opined that in the national economy, 350,000 janitorial positions existed, 490,000 assembly positions existed, and 390,000 packaging positions existed.

The ALJ asked Peters to assume the same person also could not perform simple one and two-step assemblies and could not interact adequately with coworkers and supervisors.  Peters opined that such a

person could not work.  R. 52.  The ALJ then asked Peters to assume the person from the first hypothetical, except the person "has a substantial loss in the ability to understand, remember and carry out simple instructions and to interact with the public, supervisors, and coworkers."  R. 52-53.  Peters agreed with the ALJ that such a person could not work. R. 53.  The ALJ then concluded the hearing.  R. 53.

## THE DECISION OF THE ALJ

The ALJ issued her decision on November 23, 2009.  R. 14-24.  The ALJ followed the five step analysis set forth in Social Security Administration regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of the claimant's age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  The Listings contain a description of these severe impairments.  20 C.F.R. Part 404 Subpart P, Appendix 1.  The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the claimant not to be able to return to his prior work considering his residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ determined at Steps 1 and 2 that McKenzie was not engaged in substantial gainful activity and that he suffered from severe impairments consisting of a history of learning disabilities, history of a stab wound with residual nerve damage, mood disorder, psychotic disorder, and polysubstance dependence.  R. 16.

The ALJ determined at Step 3 that McKenzie's condition did not meet a Listing.  The ALJ considered the Listings for psychotic disorders, affective disorders, mood disorders, and substance addition disorders, 20 C.F.R. Part 404 Subpart P, Appendix 1, §§ 12.03, 12.04, 12.06, and

12.09.  R. 16.  All of these Listings require under paragraph B in each
Listing that the mental impairment must result in two of the following:
marked limitations on activities of daily living; marked imitations in
maintaining social functioning; marked limitations in maintaining
concentration, persistence or pace; or repeated episodes of
decompensation, each of extended duration.   R. 16.

The ALJ determined that McKenzie had only moderate limitations on
activities of daily living and maintaining social functioning and mild
limitations on concentration, persistence and pace.  The ALJ noted that the
evidence was ambiguous.  Some of the evidence indicated that McKenzie
could not do anything for himself.  Other evidence indicated he could
largely live on his own with some limited assistance.  R. 17.  The ALJ found
that the evidence indicating that McKenzie could take care of himself
supported a finding of moderate limitations.  The ALJ cited evidence that
McKenzie went to church regularly and got along with his sister with whom
he lived, as evidence of only a moderate limitation on social functioning.  R.
17.

The ALJ found the evidence regarding concentration, persistence,
and pace to be "strongly contradictory."  R. 17.  The ALJ stated that
evidence of a lack of concentration, persistence and pace was contradicted
by Dr. Gil's diagnosis of malingering and Dr. Froman's skepticism of

McKenzie's veracity.  R. 17.  The ALJ also cited the Transitions'
counselor's finding in June 2009, that insight, judgment and impulse control
were fair.  R. 17.  In the face of this contradictory evidence, the ALJ found
"virtually no verifiable or reliable forms of evidence that support any of the
claimant's allegations."  R. 17.  Given the conflicting evidence, the ALJ
concluded that McKenzie demonstrated at most only mild limitations to his
concentration, persistence, and pace.  R. 17.

At Step 4, the ALJ found that McKenzie had the RFC to perform
medium work with no climbing ladders, ropes, or scaffolds; frequent, but
not repetitive reaching, handling, fingering, and feeling with the right arm
and hand; and only capable of unskilled work with no more than superficial
contact with the general public and no more than occasional contact with
supervisors.  R. 17.  The ALJ relied on the evidence of malingering to
discount his claims of more severe mental impairments.  R. 20.  The ALJ
found that McKenzie and his daughter were not credible.  The ALJ rejected
Failor's opinions because he was not a medical source and he was
inconsistent with the opinions of the medical sources, such as Dr. Gil.
R. 20.  The ALJ also found that McKenzie lied to Transitions by telling them
that he stopped using drugs in August 2008.  The ALJ noted that McKenzie
told Dr. Froman that he was using cocaine regularly at least as

late as February 2009.  Since Transitions personnel mistakenly assumed

McKenzie was not using drugs, their diagnoses were not reliable.  R. 20.

After determining McKenzie's RFC, the ALJ found at Step 4 that he

had no past relevant work.  R. 23.  The ALJ then found at Step 5 that

McKenzie could perform a substantial number of jobs in the national

economy.  The ALJ relied on vocational expert Peter's opinions to reach

this conclusion.  The ALJ, thus, concluded that McKenzie was not disabled.

R. 23-24.

## SUBSEQUENT PROCEEDINGS

McKenzie appealed to the Appeals Council.  On August 5, 2010,

McKenzie submitted additional evidence to the Appeals Council.

R. 513-20.  The first piece of evidence consisted of a report of an EMG

study conducted by Dr. John DeGuzman, M.D., on December 1, 2009.

R. 519-22.  Dr. DeGuzman found that McKenzie had severe right median

neuropathy across the right wrist consistent with carpal tunnel syndrome.

R. 520.  Dr. DeGuzman found no evidence of peripheral neuropathy,

radiculopathy, or brachial plexopathy.  R. 520.

The second piece of evidence consisted of a letter from Dr. Vrtikapa,

dated August 5, 2010, in which Dr. Vrtikapa stated that McKenzie was

diagnosed with paranoid schizophrenia.  Dr. Vrtikapa stated, "He is

currently stable with medications, but is unable to work due to this

diagnosis, and I do not foresee any change in his ability to work in th future."  R. 515.

The Appeals Council denied McKenzie's request for review on October 15, 2010.  R. 1.  McKenzie then filed this action for judicial review.

ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ further must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ's decision is supported by substantial evidence.  Dr. Gil's diagnosis of malingering, combined with Dr. Froman's skepticism as to McKenzie's veracity, supported the ALJ's finding that McKenzie's mental

impairments are not as severe as claimed. This evidence, combined with McKenzie's testimony that he could live alone with some assistance, supports the findings at Step 3 that McKenzie did not meet a Listing. McKenzie's arguments that the ALJ erred in this finding are not persuasive.

This evidence of malingering, combined with the evidence that McKenzie had full use of his left hand and arm, also supported the RFC finding. The ALJ addressed McKenzie's mental limitations in the RFC finding by limiting him to unskilled work with limited contact with others. The ALJ addressed the limitations of his right hand by limiting the required use of the right hand. The testimony of Peters supported the finding at Step 5 that McKenzie could perform a significant number of jobs in the national economy.

McKenzie argues that the ALJ erred in according no weight to Failor's opinions. The Court disagrees. The ALJ did not accord no weight to Failor's opinion. The ALJ considered the opinion and determined that the opinion was entitled to little weight in light of the opinion of Drs. Gil and Froman. There was no error.

McKenzie argues that the ALJ erred in his credibility determinations regarding the statements of McKenzie and McKenzie's daughter Latonya Thompson. The Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the

record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The

credibility findings are supported in the record.  Dr. Gil found that McKenzie

was malingering.  Dr. Froman doubted his veracity.  McKenzie told

inconsistent stories to various healthcare providers.  He told Dr. Gil he was

addicted to alcohol.  He told Dr. Froman he had a beer once in a while.  He

told some people he stopped using illegal drugs in August 2008.  He told

Dr. Froman he was using drugs in February 2009.  He told Dr. Gil that he

could dress himself.  He stated in the June 2008 report that he could not.

He remembered his birth date when he saw Dr. Leung.  He could not

remember his birth date when he saw Dr. Gil.  He showed up sometimes

completely disheveled.  He showed up sometimes properly dressed.  He

told some people he went to church regularly.  He told Dr. Froman that he

was inactive in religion.  These conflicting statements support a finding of a

lack of credibility.

  The finding of malingering also supports the ALJ's decision not to

credit Latonya Thompson's statement.  Thompson could have been

describing malingering behavior.  McKenzie criticizes the ALJ for

questioning Thompson's personal knowledge of McKenzie's daily living.

McKenzie lived with his brother in Chicago and then with his sister in

Quincy.  McKenzie did not live with Thompson.  This evidence provides a

basis to question Thompson's personal knowledge of McKenzie's condition

after the alleged onset of his disability in August 2008.  Given this evidence, the Court will not disturb this finding.

McKenzie criticizes the ALJ for not discussing the vocational expert's opinions that the person described in the ALJ's second and third hypothetical questions would not be employable.  The Court sees no error.  These questions did not relate to the RFC finding that the ALJ made.  The ALJ properly relied on the vocational expert's opinions based on the hypothetical question that related to the RFC finding.  There was no error.

McKenzie also relies on the evidence submitted to the Appeals Council in 2010.  That evidence is irrelevant.  The issue before this Court is whether the ALJ's findings are supported by substantial evidence.  Subsequent tests and medical opinions are irrelevant because such evidence was not before the ALJ.  <u>See</u> <u>Sample v. Shalala</u>, 999 F.2d 1138, 1144 (7th Cir. 1993).  McKenzie further does not seek a remand in light of this new evidence and does not attempt to make a showing that he would be entitled to such a remand.   <u>See</u> <u>Sears v. Bowen</u>, 840 F.2d 395, 399 (7th Cir. 1988);  42 U.S.C. § 405(g) sentence six.

WHEREFORE the decision of the Commissioner is affirmed.  All

pending motions are denied as moot.  This case is closed.


ENTER:     July 12, 2011


_____s/ Byron G. Cudmore_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE